Filed 1/29/15  P. v. Travis CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CURTIS WAYNE TRAVIS,<br><br>    Defendant and Appellant. | F066423<br><br>(Super. Ct. No. F11900298)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  W. Kent Hamlin, Judge.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Max Feinstat, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Curtis Travis committed a home invasion robbery and killed a motorist while fleeing in a vehicle which he stole from the robbery victims.  A jury convicted Travis of first degree felony murder with a robbery special circumstance finding (Pen. Code,

§§ 187, subd. (a), 189; 190.2, subd. (a)(17)(A)),[1] first degree residential robbery (§§ 211, 212.5, subd. (a)), vehicle theft (Veh. Code, § 10851, subd. (a), and leaving the scene of an accident involving injury or death (Veh. Code, § 20001, subd. (a)). He was sentenced to life in prison without the possibility of parole.

Travis appeals his convictions on multiple grounds pursuant to allegations of instructional error, ineffective assistance of counsel, insufficiency of the evidence, and defects in the verdict forms. None of the claims have merit. We therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of January 5, 2011, two people broke into an apartment located at 4111 North Blythe Avenue in Fresno. The residents of the apartment, David Ruiz and his wife, Sylvia Gutierrez, awoke to the sound of a window breaking and were soon accosted by two men. The intruders made specific demands for cash, cell phones, a laptop computer, and the keys to Mr. Ruiz's pickup truck. Upon obtaining these items, the robbers left the home and drove away in the victim's truck.

After checking on the welfare of his family, Mr. Ruiz used a neighbor's telephone to call 911. It was 1:08 a.m. when he reported the robbery. Meanwhile, police were already being dispatched to the scene of a motor vehicle collision approximately half a mile away from Mr. Ruiz's apartment, near the Highway 99 off-ramp at the intersection of Ashlan Avenue and Golden State Boulevard. A bystander reported the accident at approximately 1:06 a.m.

The traffic accident involved a collision between a Chevrolet Silverado pickup truck and a Ford Taurus sedan. Eyewitnesses reported seeing two men exit the truck and leave the vicinity of the crash on foot. The driver of the Ford Taurus was pronounced dead at the scene. It was later determined that the truck belonged to David Ruiz, and

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

police eventually arrested Curtis Travis and Stephen Stowers in connection with the robbery and the vehicular homicide.

On October 3, 2011, the Fresno County District Attorney filed an information charging Travis and Stowers with first degree murder (Count 1) and first degree residential robbery (Count 2).[2] Travis was also charged with vehicle theft (Count 3) and leaving the scene of an accident (Count 4). As to Count 1, the information contained a special circumstance allegation of murder occurring during the commission of a robbery. Count 4 was charged as a felony pursuant to the allegation that the car accident resulted in a death. (Veh. Code, § 20001, subd. (b)(2).) It was further alleged that Travis had suffered two prior convictions for vehicle theft (Veh. Code, § 10851, subd. (e)) and served four prior prison terms within the meaning of section 667.5, subdivision (b). The defendants were jointly tried before a jury in October 2012.

Prosecution Case

David Ruiz and Sylvia Gutierrez testified to their respective recollections of the robbery. Both claimed that a "light-skinned" man and a "dark-skinned" man broke into their apartment on the night in question. The men were dressed in dark clothing and had facial garments which covered at least the "lower part of the jawbone." Mr. Ruiz identified Travis in court as the light-skinned robber, recalling that as between him and his accomplice, Travis was the one who did most of the talking. Travis communicated with Mr. Ruiz in English, with the exception of his attempt to make some kind of gang reference in poorly spoken Spanish.

Mr. Ruiz was told to hand over the keys to his pickup truck, which was then parked just a few feet away from the front door to his apartment. He later heard the truck being started up and driven away after the robbers left his home. Once they were gone, Mr. Ruiz checked on his sleeping children before contacting the police. His trial

---

[2] Stowers is not a party to this appeal.

3.

testimony indicated that the crime was promptly reported. However, it was revealed on cross-examination that Mr. Ruiz had previously testified (at a preliminary hearing) that approximately "five to eight minutes" elapsed between the time the robbers departed from his home and his initiation of the 911 call.

Michael Harkness provided an eyewitness account of the motor vehicle collision. While driving home from work at approximately 1:00 a.m., Mr. Harkness took the Ashlan Avenue exit from northbound Highway 99 and entered the far right lane of the three-lane off-ramp. He stopped for a red light at the end of the ramp and waited to turn right on to eastbound Ashlan Avenue. The weather conditions were "really foggy," but he could see a white car in the far left lane which appeared to be waiting to turn on to westbound Ashlan Avenue. When the light turned green, Mr. Harkness looked both ways and prepared to make his turn when suddenly he heard a loud noise and saw a truck in the eastbound lane of Ashlan Avenue collide with the white car in the middle of the intersection.

The force of the collision pushed the white car eastward into the path of Mr. Harkness's vehicle and caused the truck to spin around such that it came to rest in the middle of the intersection with its front end facing west. Mr. Harkness saw two men emerge from opposite sides of the truck and noticed that the driver was covering his face with his hand and forearm. Mr. Harkness got out of his vehicle and asked the men if they were okay, but they waved him off and disappeared from the scene after he turned around to check on the other driver.

The driver of the white car was a 50-year-old man named Heliodoro Ruvalcaba. Testimony from Dr. Venu Gopal of the Fresno County Coroner's Office established that Mr. Ruvalcaba died immediately from head and chest injuries sustained during the crash. Toxicology results were negative for the presence of alcohol or illegal drugs at the time of death.

4.

Detective Brian Hance of the Fresno Police Department's Traffic Bureau conducted an investigation into the collision, which included a visual inspection of the scene and other accident reconstruction efforts. His testimony described the conditions on the night of the incident as "very foggy, very cold, [and] wet," with visibility of approximately 300 feet. The intersection where the collision occurred was controlled by traffic lights, and they appeared to be working properly. Detective Hance determined that the pickup truck was travelling at approximately 57.9 miles per hour when it collided with Mr. Ruvalcaba's car, exceeding the 45 miles per hour speed limit for that section of Ashlan Avenue.

Mr. Ruiz's truck sustained extensive front-end collision damage. The rear and driver's side windows were shattered, and interior damage to the windshield led Detective Hance to conclude that two people were in the vehicle at the time of the crash. He assumed both occupants exited through the broken driver's side window, but made no attempt to open the doors of the truck during his investigation.

Jacquez Narvaez, who lived in the same apartment complex as Mr. Ruiz, testified to his knowledge of Travis' and Stowers' whereabouts prior to the robbery. Narvaez claimed both men were at his apartment on the evening of January 4, 2011 and into the early part of the next day, drinking liquor and smoking marijuana with him and another individual named Trennell. Travis eventually told the group that he knew of a place where they could "get some stuff" and asked if anyone wanted to go with him to the unspecified location. Narvaez and Trennell passed on the offer, but Stowers was apparently interested; he and Travis soon departed from Narvaez's apartment together while the other two men stayed behind. Narvaez was initially reluctant to share this information with the authorities, and actually gave false information to police during the early stages of their investigation, but he later called in a tip to the Crime Stoppers hotline which led to the defendants' arrest.

Detective Manuel Romero provided testimony regarding statements made to him by Travis and Stowers during custodial interviews. Stowers admitted to participating in the robbery and being involved in the fatal car crash. He claimed that he was sitting in the passenger seat of Mr. Ruiz's truck when the collision occurred. The driver of the truck had been speeding, and Stowers asked him to stop the vehicle and let him out, but his requests were ignored.[3]

Travis told police that he had no involvement in any of the crimes, and denied that he had ever visited the apartment complex where Mr. Ruiz lived or been inside of his pickup truck. The latter denial was proven false by DNA evidence, which was presented to the jury through the testimony of Scott Lewis, a criminalist at the Department of Justice laboratory in Fresno. Travis' DNA was matched to blood samples found on the exterior driver's side door handle of the truck; in a location to the right of the driver's side door on the exterior of the vehicle; on the interior armrest of the driver's side door; and on the interior windshield in a location slightly right of the rearview mirror. Stowers' DNA was matched to blood samples found on the interior passenger's side door and windshield.

Defense Case

Travis took the stand in his own defense. He acknowledged multiple prior felony convictions for theft-related offenses, and his former membership in the Bulldogs street gang. Travis also admitted that he lied to police about where he had been on the night of the robbery.

Travis testified that he spent the evening at Jacquez Narvaez's apartment drinking whiskey and smoking marijuana with Narvaez and two black males, one of whom was

_____

[3] Stowers informed police that Travis was driving the truck at the time of the accident. This part of his confession was excluded at trial pursuant to the *Aranda/Bruton* rule (*People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123).

Stowers.  The other black man did not identify himself.  Once they finished drinking their bottle of liquor, Travis left the apartment and began to walk home.  Within approximately five minutes of his departure, Stowers and the unidentified black man drove up to him in a pickup truck and asked Travis if he knew of anyone who wanted to buy cell phones and a laptop computer.  Travis replied that his brother-in-law would likely be interested in the items, and agreed to go with them to meet up with the potential buyer.  Travis climbed into the back of the truck's cabin and sat behind Stowers, who was located in the front passenger seat.  The driver of the truck collided with a vehicle on Ashlan Avenue approximately one minute later.

Accounting for the presence of his DNA, Travis explained that he was thrown forward as a result of the collision and sustained cuts on his left hand and the inside of his mouth.  He later climbed over the front seat and attempted to exit the vehicle by opening the driver's side door, first trying the inside handle and then reaching through the broken window to use the exterior handle, but found that the door was stuck.  He crawled out through the driver's side window and then proceeded to walk home.

Mark Whelchel, a retained expert in the field of accident reconstruction and occupant kinematics, testified to the plausibility of Travis' story.  Mr. Whelchel was of the opinion that there were three people inside of Mr. Ruiz's truck when the accident occurred.  He further opined that the blood sample found to the right of the rearview mirror on the interior windshield (which was matched to Travis through DNA testing) did not come from the person who was driving the vehicle.

Other defense witnesses included Mitchell Eisen, Ph.D., a self-described memory expert whose testimony was intended to challenge the reliability of David Ruiz's identifications of Travis during a photographic lineup and again at trial, and Michael White, a police officer who had spoken to witness Michael Harkness at the scene of the car crash.  According to Officer White, Mr. Harkness reported seeing two black males exit from the truck that was involved in the collision (Mr. Harkness refuted this allegation

7.

during the prosecution's case-in-chief). The defense also played an audio recording of a 911 call made by Isaias Rodriguez, i.e., the bystander who initially reported the accident. The caller said that he had observed two black males walking away from the scene.

Travis' final witness was a private investigator named Ken Watkins. Mr. Watkins had attempted to recreate the drive from Mr. Ruiz's apartment complex to the scene of the fatal collision for purposes of establishing possible distances and travel times between the two locations. The investigator identified two possible routes, and drove each of them twice at an approximate speed of 35 to 40 miles per hour. According to his trial testimony, the first route covered a distance of 0.6 miles, which he traversed in two minutes and 45 seconds on the first attempt and two minutes and 50 seconds on the second. The alternate route was first measured at 0.9 miles and later at exactly one mile, with identical driving times of two minutes and 55 seconds.

## DISCUSSION

### Failure to Instruct on the "Escape Rule"

Travis asserts that the trial court erred by failing to instruct the jury, sua sponte, with CALCRIM No. 3261. This pattern instruction is designed to assist jurors in determining whether a perpetrator reached a place of temporary safety for purposes of the so-called "escape rule." Under this rule, a killing committed by a felon during his or her flight from the scene of the crime, and before reaching a place of temporary safety, is within the scope of the felony murder statute (§ 189). (*People v. Wilkins* (2013) 56 Cal.4th 333, 341 (*Wilkins*).)

The escape rule is closely connected to the continuous transaction doctrine, i.e., the concept that felony murder liability may be found in the absence of a strict causal or temporal relationship between the underlying felony and the act resulting in death so long as it is proven beyond a reasonable doubt that the crime and the killing were part of one continuous transaction. (*Wilkins*, *supra*, 56 Cal.4th at pp. 340, 342.) Such a transaction may include the defendant's flight after the felony is committed. (*Id*. at p. 340.) When

8.

the killing occurs during flight, the escape rule establishes the "'outer-limits of the "continuous-transaction" theory.'" (*Id.* at p. 345, quoting *People v. Portillo* (2003) 107 Cal.App.4th 834, 846.)

Travis did not ask the trial court to provide the jury with instructions on the continuous transaction doctrine or the escape rule. At the request of the prosecutor, the jury was instructed with former CALCRIM No. 549, which defined the term "one continuous transaction." [4] Had the jury also received instructions pursuant to CALCRIM No. 3261, which Travis argues was mandatory under the facts of the case, it would have been told that a perpetrator is considered to have reached a place of temporary safety if he or she (1) has successfully escaped from the scene; (2) is no longer being chased; (3) has unchallenged possession of the stolen property; and (4) is no longer in continuous physical control of the person who is the target of the robbery. (CALCRIM No. 3261 (2006 rev.).)

---

[4] CALCRIM No. 549 was revoked in August 2013. As provided to the jury in this case, the instruction read: "In order for the People to prove that a defendant is guilty of murder under a theory of felony murder and that the special circumstance of murder committed while engaged in the commission of robbery has been proven, the People must prove that the robbery and the act causing the death were part of one continuous transaction. The continuous transaction may occur over a period of time and in more than one location. [¶] In deciding whether the act causing the death and the robbery were part of one continuous transaction, you may consider the following factors: 1. Whether the robbery and the fatal act occurred at the same place; 2. The time period, if any, between the robbery and the fatal act; 3. Whether the fatal act was committed for the purpose of aiding the commission of the robbery or escape after the robbery; 4. Whether the fatal act occurred while the perpetrator was fleeing from the scene of the robbery or otherwise trying to prevent the discovery or reporting of the crime; 5. Whether the robbery was the direct cause of the death; AND 6. Whether the death was a natural and probable consequence of the robbery. [¶] It is not required that the People prove any one of these factors or any particular combination of these factors. The factors are given to assist you in deciding whether the fatal act and the robbery were part of one continuous transaction."

"Whether or not the trial court should have given a 'particular instruction in any particular case entails the resolution of a mixed question of law and fact,' which is 'predominantly legal.'" (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568 (*Hernandez*), quoting *People v. Waidla* (2000) 22 Cal.4th 690, 733.) Travis' claim is therefore subject to de novo review. (*Hernandez, supra*, 217 Cal.App.4th at p. 568.) For the reasons hereafter stated, we reject his assertions of error and conclude that there is no basis for reversal due to the absence of an instruction on the escape rule.

"The trial court is charged with instructing upon every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) Travis' argument that the trial court had a sua sponte duty to instruct on the escape rule overlooks the reality that such an instruction would have been inconsistent with the defense he presented at trial. He denied participating in the robbery and thus had no reason to argue (and did not argue) that he had reached a place of temporary safety at the time of the killing. Given his theory of the case, it was logical that his trial attorney did not request an instruction on this concept.

Travis' position on appeal is based on *Wilkins, supra*, where the California Supreme Court found reversible error in a trial court's refusal to grant a defendant's request to have jurors instructed on the escape rule. The trial court had utilized CALCRIM No. 549 to instruct on the continuous transaction doctrine, but ruled that an additional instruction under CALCRIM No. 3261 was not appropriate. The factual circumstances in *Wilkins* were markedly different from those in this case. The *Wilkins* defendant was prosecuted for felony murder after a stove fell off the back of his pickup truck while he was driving on a four-lane highway, causing a fatal traffic accident. (*Wilkins, supra*, 56 Cal.4th at pp. 338-339.) He had stolen the appliance while burglarizing a partially constructed home, and the evidence presented an issue regarding whether or not he had reached a place of temporary safety when the killing occurred.

10.

"Even under the prosecution's theory of events, defendant was 62 miles away from the scene of the burglary when the stove fell off his truck and he had been driving on the freeway at normal speeds for about an hour. There was no evidence that anyone was following him or that anyone was even aware of the burglary." (*Id*. at pp. 347-348.)

Travis argues the *Wilkins* opinion "held that giving CALCRIM No. 549 without instruction on the escape rule results in misinstruction on an essential element of felony murder, which must be reviewed as federal constitutional error using the *Chapman* test [*Chapman v. California* (1967) 386 U.S. 18 (*Chapman*)]." His synopsis is not entirely accurate. The *Wilkins* opinion explains that an instruction on the escape rule was necessary in that case not simply because the jury had been instructed with CALCRIM No. 549, but because there was substantial evidence in the record from which jurors could have concluded that the defendant was not in flight and had reached a place of temporary safety. (*Wilkins*, *supra*, 56 Cal.4th at pp. 347-349.) A footnote to the opinion states, "We express no opinion on whether CALCRIM No. 549 would be correct or complete when given in a case that did not raise an issue of the applicability of the escape rule." (*Id*. at p. 350, fn. 5.)

As previously mentioned, a trial court's sua sponte duty to instruct on general principles of law and potential theories of the case is limited to those that are relevant to the issues raised and supported by substantial evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1200 (*Young*); *People v. Cavitt* (2004) 33 Cal.4th 187, 204.) "Evidence is 'substantial' only if a reasonable jury could find it persuasive." (*Young*, *supra*, 34 Cal.4th at p. 1200.) "If the court has properly instructed on the required relationship between the felony and the murder, which relationship is an element of the crime, the trial court has no sua sponte duty to clarify or amplify the scope of that element if the evidence does not raise an issue as to whether that relationship exists." (*Wilkins*, *supra*, 56 Cal.4th at p. 347.)

Here, no reasonable juror could have found that Travis had reached a place of temporary safety at the time of victim Heliodoro Ruvalcaba's death. Travis was travelling in a stolen vehicle on public streets while committing multiple obvious violations of the Vehicle Code by driving at excessive speeds and failing to obey traffic signals, not to mention that he had admittedly consumed alcohol and marijuana beforehand. (Cf. *People v. Young* (1992) 11 Cal.App.4th 1299, 1306 ["[I]t is significant that appellant was driving the vehicle which he stole in the robbery. The jury could conclude appellant was not safe while driving the stolen vehicle on public streets."].) Further, under his own version of the facts, the vehicular homicide occurred within minutes of the theft of David Ruiz's truck and less than a mile away from Mr. Ruiz's home. It is beyond dispute that the fatal car crash occurred while the robbers were in flight, and that the robbery and the killing occurred as part of one continuous transaction.

Travis contends that our assessment of the evidence must be conducted in light of the four guidelines set forth in CALCRIM No. 3261, which he characterizes as a dispositive factor test in regards to the question of whether a robber has reached a place of temporary safety. He emphasizes that the California Supreme Court cited this instruction approvingly in *Wilkins*, *supra*, where the predicate felony was burglary. This case involves a robbery. Although we express no opinion regarding the correctness of CALCRIM No. 3261 in the context of robbery, it should be noted that pattern jury instructions "are not themselves the law, and are not authority to establish legal propositions or precedent. … At most, when they are accurate, … they restate the law." (*People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7.)

The current version of CALCRIM No. 3261 indicates that a robber has reached a place of temporary safety if he or she has "successfully escaped from the scene [;] … (is/are) not or (is/are) no longer being chased [;] … (has/have) unchallenged possession of the property [; and] … (is/are) no longer in continuous physical control of the person who is the target of the robbery." (CALCRIM No. 3261 (2013 rev.).) Parsing the

12.

language of the instruction, Travis claims that the scene of the robbery was the home of victim David Ruiz, and that he had "successfully escaped from the scene" by the time he reached the intersection of Highway 99 and Ashlan Avenue. We have difficulty reconciling this argument with the principle that robbery, unlike burglary, "is not confined to a fixed location, but may be spread over a considerable distance and varying periods of time." (*People v. Johnson* (1992) 5 Cal.App.4th 552, 561 (*Johnson*), citing *People v. Salas* (1972) 7 Cal.3d 812, 822 (*Salas*); accord *People v. Debose* (2014) 59 Cal.4th 177, 204-205 ["'[T]he crime of robbery is not confined to the act of taking property from victims. The nature of the crime is such that a robber's escape with his loot is just as important to the execution of the crime as obtaining possession of the loot in the first place.'"].) Moreover, "[w]hen the robber is still in flight, he or she has not yet achieved a place of temporary safety." (*Johnson*, *supra*, 5 Cal.App.4th at p. 559.)

Travis further reasons that he must have reached a place of temporary safety when the killing occurred because Mr. Ruiz had not yet reported the robbery to police. Therefore, since no one was actually chasing him at the time, the evidence satisfied the second condition described in CALCRIM No. 3261. This argument conflicts with the holding in *People v. Russell* (2010) 187 Cal.App.4th 981 (*Russell*), where the appellant claimed that liability under the escape rule requires evidence showing the perpetrator was actively chased from the scene of the felony (in that case a burglary), or at a minimum that someone reported the crime to police following the perpetrator's departure from the scene. (*Russell*, *supra*, 187 Cal.App.4th at p. 987.) The Fourth District Court of Appeal rejected this argument, concluding that "it is not necessary to show the felon was either chased from the scene or that without the felon's knowledge police had been called" in order to establish that the homicide and the underlying felony were part of one continuous transaction. (*Id*. at pp. 991-992 [defendant drove stolen car unpursued from the site of an unreported burglary, saw police vehicle four miles away and 12 minutes later, which triggered reckless evasion of police ending in fatal crash; no place of

13.

temporary safety reached after the burglary].)  Likewise, in *Salas*, *supra*, our Supreme Court determined that continuous flight is sufficient to establish the ongoing nature of a robbery, even in the absence of "continuous challenging pursuit."  (*Salas*, *supra*, 7 Cal.3d at pp. 822-823.)

In summary, the trial court below instructed the jury on the continuous transaction doctrine, thereby identifying the required relationship between the predicate felony and the subject homicide.  There was no sua sponte duty to clarify or amplify the scope of this element because the evidence did not raise an issue as to its existence.  In other words, no juror could have reasonably doubted that the killing occurred while the robbers were in immediate flight.  Had the jury believed Travis' testimony and accepted his theory of the case, it would have concluded that he did not steal Mr. Ruiz's truck and would have been obligated to acquit him of first degree murder regardless of the continuing nature of the robbery.

Were we to assume an instructional error occurred with respect to the escape rule, we would conclude that any such error was harmless, even under the *Chapman* standard (*Chapman*, *supra*, 386 U.S. at p. 24 [the reviewing court must be satisfied beyond a reasonable doubt that the error complained of did not contribute to the verdict]).  By convicting Travis on Counts 2, 3, and 4, the jury necessarily found that he participated in the robbery *and* was the driver of the stolen vehicle that crashed into the homicide victim. (See Veh. Code, § 20001, subd. (a).)  It follows that the jury disbelieved his story about the robbers stopping to discuss how they would fence the stolen items in between their departure from Mr. Ruiz's home and their collision with Mr. Ruvalcaba's car.  The evidence reflected a very brief interval of time between the incidents, and the close physical proximity of Mr. Ruiz's apartment to the scene of the homicide.  These circumstances, coupled with the fact that Travis was speeding on a public road in an automobile which he stole during the course of the robbery, nullify any argument that the jury might have found he was not in flight when the killing occurred, and that the robbery

14.

and killing were not part of one continuous transaction because the robbers had reached a place of temporary safety. It is evident, beyond a reasonable doubt, that the alleged instructional error had no impact on the jury's verdict.

**Constitutional Claims**

Seizing upon a comment made by the trial court during a break in closing arguments, Travis alleges that he was prohibited from advancing a defense under the theory that he had reached a place of temporary safety when the killing occurred. The trial court's "ruling" allegedly resulted in a violation of his constitutional rights to present a defense and receive the effective assistance of counsel. These claims are forfeited due to appellant's failure to raise the issue at the time of trial. We also find no support for his arguments in the record.

As discussed, Travis made no attempt to argue that the robbery was not still in progress at the time of Mr. Ruvalcaba's death, nor did he request a jury instruction on the escape rule. The jury received its instructions from the trial court prior to the delivery of closing arguments by counsel. During a break in the prosecution's closing, the court advised the attorneys of its intention to revise the wording of Travis' verdict form with respect to the special circumstance allegation under Count 1 to have it match the language of CALCRIM No. 730 (indicating that the defendant was accused of murder committed while engaged in the commission of robbery). The relevant exchange was as follows:

| Trial Court: | [CALCRIM No.] 730 reads, "Defendant is charged with a special circumstance of murder committed while engaged in the commission of," and then the blank for the term robbery, and that's the language that – that the instruction uses, and it does not refer to immediate flight from the robbery. I would concede that that is a more specific allegation, and it is in the statute, but it's not in the pattern instruction. For that reason I've prepared the instruction consistent with the CALCRIM pattern. |

It should be clear that – I don't think that anybody can argue that this was not immediate flight after the robbery, and certainly the statute seems to suggest that whether it was in the commission of the robbery or immediate flight after the robbery, the special circumstance would apply. So I guess my point here is I was gonna make the verdict form consistent with the language in the instruction, but I am going to let [the prosecution] argue that immediate flight after commission of the crime of the robbery is in fact part of the commission of the robbery, and then I think [the prosecution] has to point to [CALCRIM No.] 549 as to how those factors support that conclusion, but I don't think it would be appropriate for anyone to say that the robbery was concluded when the parties had not reached a place of temporary safety under any construction of the evidence.

So with that said, I intend to make the special circumstance allegation finding on Mr. Travis' verdict form the same as that which I have for Mr. Stowers, and I think that's consistent with the instruction. And frankly it may be that the instruction could be more complete, but I believe the principles there with respect to what is or isn't during the commission of a crime or one continuous transaction is really what controls, so that's the reason for that selected language.

Want to be heard on that, Mr. Wright?

Prosecutor: No, I would agree that the wording should be the same on both verdict forms for Mr. Travis and Mr. Stowers.

Trial Court: Mr. Green?

[Stowers' counsel]: No.

Trial Court: Mr. Drandell?

[Travis' counsel]: Submit.

Trial Court: All right. I'll get you each a copy then. We're in recess.

Constitutional rights can be forfeited, even in a criminal case, by failure to make a timely assertion of those rights. (*People v. Saunders* (1993) 5 Cal.4th 580, 590.) Travis'

16.

newly adopted position regarding the escape rule was never presented to the trial court. We need not consider his argument that the court committed an error of constitutional magnitude by not allowing him to proceed on an exculpatory theory that was never asserted. Appellate review of the alleged error has been forfeited. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1088.)

Even were the issue properly before us, the record shows that the trial court merely expressed its view on the state of the evidence during a colloquy with the attorneys. The parties had an opportunity to express any contrary beliefs which they may have held, but none did. The incident did not involve a preclusive ruling, nor did it result in a violation Travis' constitutional rights.

**Failure to Instruct on Proximate Cause**

Travis next complains that the jury did not receive instructions on proximate cause in relation to the required elements of felony murder. This is another issue that has been raised for the first time on appeal. The claim fails on the merits.

Background

The trial court instructed the jury with a modified version of CALCRIM No. 540A, which identified the prima facie elements of felony murder as follows:

> "Each defendant is charged in Count 1 with murder, under a theory of felony murder. This instruction applies to a defendant if you find that he was the driver of the vehicle that collided with the vehicle driven by Heliodoro Ruvalcaba. [¶] To prove a defendant guilty of first degree murder under this theory, the People must prove that: [¶] 1. The defendant committed robbery; 2. The defendant intended to commit robbery; AND 3. While committing robbery the defendant caused the death of another person. [¶] A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent. [¶] To decide whether the defendant committed robbery, please refer to the separate instructions that I will give you on that crime. You must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony murder. [¶] The defendant must have intended to commit the robbery before or at the time that he caused the death. [¶] It is not required that the person die immediately, as long

17.

as the cause of death and the robbery are part of one continuous transaction.  The term 'one continuous transaction' is more fully described in instruction number 549, which follows. [¶] It is not required that the person killed be the victim of the robbery."

The above instruction was given at the request of the prosecutor.  Travis did not request an instruction on proximate causation, nor did he claim that there was an intervening and superseding cause of Heliodoro Ruvalcaba's death apart from the motor vehicle collision.  He now contends that the trial court had a sua sponte duty to instruct on these concepts using either CALCRIM No. 240 or CALCRIM No. 540C.[5]  In a related argument, Travis claims the court erred by modifying CALCRIM No. 540A to refer to "the driver of the vehicle that collided with the vehicle driven by Heliodoro Ruvalcaba," because doing so suggested that it was a defendant driver, rather than the victim, who actually caused the fatal car accident.  The use of this language is said to have removed the issue of causation from the jury's consideration.

Analysis

"It is settled that with respect to the theory of felony murder, there is no strict causal relationship between the felony and the homicide.  Rather, the focus is on the underlying felony, that is[,] whether the felony has been completed, abandoned, stopped, or is ongoing."  (*People v. Pock* (1993) 19 Cal.App.4th 1263, 1276.)  Trial courts have a sua sponte duty to instruct on proximate cause only if causation is at issue, not when the dispositive question is whether the defendant committed the crime which resulted in

_____

[5] CALCRIM No. 540C states, in pertinent part, "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.  A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence."  (CALCRIM No. 540C (2013 rev.), original italics.)  CALCRIM No. 240 similarly explains proximate cause in terms of the natural and probable consequences doctrine.

18.

death.  (*People v. Brasure* (2008) 42 Cal.4th 1037, 1056 (*Brasure*).)  "[A] trial court 'is never required to give any instructions that would have had no foundation in the evidence or in any theory on which the case was tried.'"  (*People v. Tapia* (1994) 25 Cal.App.4th 984, 1024-1025.)

To establish the existence of a sua sponte duty to instruct on proximate causation, Travis would need to show that the evidence reasonably suggested the possibility of an intervening cause of death independent of his felonious conduct.  (*Brasure*, *supra*, 42 Cal.4th at p. 1056; *People v. Huynh* (2012) 212 Cal.App.4th 285, 310-311.)  "'However, in order to be "independent" the intervening cause must be "unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause."'"  (*People v. Cervantes* (2001) 26 Cal.4th 860, 871.)  Indeed, the drafters of the CALCRIM instructions recommend that CALCRIM No. 540C only be used "for the unusual factual situations where a victim dies during the course of a felony as a result of a heart attack, a fire, or a similar cause, rather than as a result of some act of force or violence committed against the victim by one of the [perpetrators]."  (Judicial Council of Cal., Crim. Jury Instns. (2014) Introduction to Felony-Murder Series, p. 316.)

The undisputed evidence in this case shows that the homicide victim died as a direct result of the collision between his car and a vehicle in which fleeing felons were travelling.  The only issue was whether Travis committed the predicate felony.  The trial court did not err by failing to provide sua sponte instructions on proximate causation.

Turning to Travis' secondary argument, we find no grounds for reversal based on the language used in the modified version of CALCRIM No. 540A which characterized the driver of the stolen vehicle as the person responsible for Mr. Ruvalcaba's death.  Travis' speculation that the victim may have made an illegal turn into the intersection where the cars collided is irrelevant.  A victim's negligence does not relieve the criminal actor of liability unless such negligence is the sole cause of death, meaning that it constitutes "an unforeseeable intervening cause, [i.e.,] *an extraordinary and abnormal*

19.

*occurrence*, which rises to the level of an exonerating, superseding cause." (*People v. Morse* (1992) 2 Cal.App.4th 620, 639, quoting *People v. Armitage* (1987) 194 Cal.App.3d 405, 420-421.)  Travis did not present any theories of intervening causation at trial, nor would such a defense have been tenable.  The possibility that a motorist might cross paths with robbers who are fleeing in a stolen vehicle is foreseeable, and that it actually happened was not an extraordinary and abnormal occurrence.

**Ineffective Assistance of Counsel**

Travis maintains that his trial counsel provided ineffective assistance by failing to request jury instructions on the escape rule and/or proximate causation.  To prevail on this claim, he must first show that his attorney's performance fell below an objective standard of reasonableness.  (*Strickland v. Washington* (1984) 466 U.S. 668, 688 (*Strickland*); *People v. Anderson* (2001) 25 Cal.4th 543, 569 (*Anderson*).)  "Even where deficient performance appears, the conviction must be upheld unless the defendant demonstrates prejudice, i.e., that, ""'but for counsel's unprofessional errors, the result of the proceeding would have been different.'"""  (*Anderson*, *supra*, 25 Cal.4th at p. 569.)

Travis' claim fails under both prongs of the *Strickland* test.  The failure to request a factually and legally unsupported instruction is not ineffective assistance of counsel. (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 836.)  Based on our analysis in earlier portions of the opinion, we conclude that Travis' lawyer did not render deficient performance.  The unlikelihood that the outcome of the case would have been different but for counsel's alleged errors is also readily apparent from the record.

**CALCRIM No. 302**

The jury received instructions pursuant to CALCRIM No. 302 regarding the evaluation of conflicting evidence.  Travis requested that this particular instruction be given.  He now contends, however, that the instruction "diluted" the prosecution's burden of proof vis-à-vis his defense of third party culpability.

The challenged instruction reads, "If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe. Do not simply count the number of witnesses who agree or disagree on a point and accept the testimony of the greater number of witnesses. On the other hand, do not disregard the testimony of any witness without a reason or because of prejudice or a desire to favor one side or the other. What is important is whether the testimony or any other evidence convinces you, not just the number of witnesses who testify about a certain point."

CALCRIM No. 302 has been upheld as an appropriate jury instruction in several appellate decisions. (See e.g., *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1190-1191; *People v. Anderson* (2007) 152 Cal.App.4th 919, 938-940; *People v. Reyes* (2007) 151 Cal.App.4th 1491, 1497.) "A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*People v. Lee* (2011) 51 Cal.4th 620, 638.) Travis did not seek modification or clarification of the instruction he now challenges.

Regardless of whether the claim is cognizable on appeal or has been forfeited, Travis' contentions are not persuasive. The crux of his argument is that CALCRIM No. 302 suggests the trier of fact must be convinced by the evidence adduced at trial in order to decide the case, thereby implying that the jury is required to believe defense evidence in order to return a "not guilty" verdict. Such a misconception would confuse jurors as to the parties' respective burdens of production and proof (or lack thereof), and mislead them to believe that a defendant who relies on a third party culpability defense must prove some other person committed the charged crime. This is a novel hypothesis, but jury instructions "'should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.'" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1112.) The relevant inquiry concerns not the mere possibility of juror confusion, but whether, "'in the context of the instructions as a whole

21.

and the trial record, there is a reasonable likelihood that the jury was misled to defendant's prejudice.' [Citation.] ""'Also, we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.'""" (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 475.)

The jury was instructed with CALCRIM No. 100, which explains that, "[b]ecause they are presumed innocent, the defendants do not have to prove that they are not guilty." The jury also received CALCRIM No. 103 (the presumption of innocence and the People's burden of proof) and No. 220 (reasonable doubt), both of which conclude with the following statement: "Unless the evidence proves a defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." Having received such explicit instructions on the question of guilt or innocence, it is not reasonably likely that the jury misconstrued CALCRIM No. 302 to mean Travis was required to exonerate himself by proving someone else was guilty of the crimes he was accused of committing, or that he could be convicted in the absence of proof beyond a reasonable doubt that he was the actual perpetrator. We assume the jury understood, correlated, and followed its instructions, and therefore reject Travis' assertions of error and prejudice.

**Sufficiency of the Evidence**

Travis challenges the sufficiency of the evidence supporting the robbery-murder special circumstance finding and his conviction under Count 4. All of his arguments pertain to the jury's conclusion that he was driving David Ruiz's stolen truck at the time of the fatal car crash. In order to find the special circumstance allegation true, the jury had to find either that Travis was the actual killer (§ 190.2, subd. (b)) or that he was a major participant in the robbery and acted with reckless indifference to human life (§ 190.2, subd. (d)). Regarding Count 4, a conviction under Vehicle Code section 20001 requires proof that the driver of a vehicle involved in an accident resulting in death or injury left the scene without rendering reasonable assistance to the injured party or

providing identifying information to police.  (Veh. Code, § 20001, subd. (a); *People v. Powell* (2010) 181 Cal.App.4th 304, 315-316.)

"In reviewing a criminal conviction challenged as lacking evidentiary support, '"the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."'"  (*People v. Streeter* (2012) 54 Cal.4th 205, 241.)  Every fact the jury could reasonably deduce from the evidence is presumed in favor of its verdict.  (*People v. Jones* (1990) 51 Cal.3d 294, 314.)  A jury's findings on special circumstance allegations are reviewed under the same standard.  (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.)  Reversal is not warranted unless the evidence is insufficient to support the verdict under any hypothesis.  (*People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*).)  The appellate court cannot reweigh the evidence, reinterpret the evidence, or substitute its judgment for that of the jury.  (*People v. Baker* (2005) 126 Cal.App.4th 463, 469.)  "'"Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends."'"  (*People v. Lewis* (2001) 26 Cal.4th 334, 361.)

Although Travis insists the evidence points to a third perpetrator who eluded detection, victims David Ruiz and Sylvia Gutierrez testified that there were only two robbers.  Mr. Ruiz identified Travis in court as the primary culprit, i.e., the person who demanded the keys to his truck and with whom he had the most interaction while the robbers were in his house.  This testimony alone was sufficient to establish Travis' participation in the robbery, and to support the jury's implied finding that Travis' story about an additional accomplice was fictional.  (*Young*, *supra*, 34 Cal.4th at p. 1181

23.

["unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction."].)

Michael Harkness testified to seeing only two people emerge from Mr. Ruiz's truck after the fatal collision. An investigating officer claimed that Mr. Harkness initially described these individuals as black males, but Mr. Harkness denied making such a statement ("I saw that in the [police] report, but I did not tell them that."). The jury was free to believe Mr. Harkness' testimony and reject the conflicting evidence. It was also the jury's prerogative to deem unreliable the statement made by Isaias Rodriguez to a 911 dispatcher about seeing two black males walking away from the scene of the accident. Mr. Rodriguez did not testify at trial, and there was no additional evidence to indicate the vantage point from which he observed the suspects or how well he could see them in the dark and foggy weather conditions.

DNA evidence placed Travis and Stowers inside of the stolen truck, but there was no such evidence of a third perpetrator. Nevertheless, Travis argues the DNA samples at best presented a "coin flip" scenario in terms of which person had most likely driven the vehicle. We disagree. The evidence concerning Stowers' confession to police was highly probative of this issue; he admitted being in the truck at the time of the accident but unequivocally denied that he was the driver. The physical evidence corroborated his version of events. Stowers' blood was only found on the passenger side of the truck, but Travis left traces of his DNA in multiple locations on the interior and exterior of the driver's side of the vehicle.

Detective Hance's theory that both occupants exited the truck through the driver's side window was inconsistent with the firsthand observations of Mr. Harkness, whose testimony indicated that the driver exited through the driver's side door and the passenger exited on the passenger side. Again, it fell within the jury's province to credit the testimony of Mr. Harkness and disregard Detective Hance's hypothesis as unlikely or implausible. Detective Hance's opinion was supposedly based on a "common sense"

24.

deduction, but he never explained why he believed the passenger would have exited the vehicle by crawling through a broken window on the driver's side rather than simply opening the passenger side door.

Considering the record as a whole, we conclude there is sufficient evidence from which a rational trier of fact could have found that Travis was the driver of the stolen truck, which would make him the actual killer of Heliodoro Ruvalcaba.[6] It is undisputed that the driver left the scene without providing identification or attempting to render assistance to the victim, thus satisfying the remaining elements necessary to establish a violation of Vehicle Code section 20001. Substantial evidence supports both the special circumstance finding and the conviction under Count 4.

**Alleged Defects in the Verdict Form**

The verdict form used for the charge of first degree murder and the robbery-murder special circumstance allegation asked the jury to indicate whether the latter allegation was "proved" or "not proved." Travis did not object to this wording, but now contends the jury should have been asked to find that the special circumstance allegation was either "true" or "not true." He argues that the absence of an express "true" finding in the jury's verdict is a structural defect which invalidates his sentence of life without the possibility of parole. This claim, which strikes us as borderline frivolous, has been forfeited. (*Bolin*, *supra*, 18 Cal.4th at p. 330 [failure to timely object to the form of a verdict forfeits the issue on appeal]; see *People v. Paul* (1998) 18 Cal.4th 698, 706-707 [the form of the verdict is generally immaterial so long as the jury's intentions are

---

[6] We reject Travis' ancillary claim regarding the trial court's failure to define the term "actual killer" as used in CALCRIM No. 703, an instruction that addresses aiding and abetting liability for an accomplice who is "not the actual killer" in a felony murder case. Travis forfeited the claim by not requesting a clarifying instruction at the time of trial. The claim is also without merit because the term "actual killer" had a self-explanatory and commonly understood meaning within the context of the instruction.

25.

apparent]; *People v. Jones* (1997) 58 Cal.App.4th 693, 710 ["""A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court.""""].)

## **DISPOSITION**

The judgment is affirmed.


_____

Gomes, J.

WE CONCUR:


_____

Hill, P.J.


_____

Cornell, J.